## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

ELLEN DWYER,                    :
                               :
              Plaintiff        :        **No. 3:13-CV-2114**
                               :
        vs.                    :        **(Judge Nealon)**
                               :
CAROLYN W. COLVIN, Acting      :
Commissioner of Social Security, :
                               :
              Defendant        :

FILED
SCRANTON

SEP 1 2 2014

PER _____
        DEPUTY CLERK

## MEMORANDUM

On August 9, 2013, Plaintiff, Ellen Dwyer, filed this appeal[1] under 42

U.S.C. § 405 for review of the decision of the Commissioner of Social Security

denying her claim for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 400-403. (Doc. 1). The parties have fully

briefed the appeal. For the reasons set forth below, the decision of the

Commissioner denying Plaintiff's application for DIB will be affirmed.

## BACKGROUND

Plaintiff protectively filed[2] her application for DIB on March 9, 2011. (Tr.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits. A protective filing date allows

52).[3]  This claim was initially denied by the Bureau of Disability Determination

("BDD")[4] on May 26, 2011.  (Tr. 52).  On June 9, 2011, Plaintiff filed a written

request for a hearing before an administrative law judge.  (Tr. 52).  A hearing was

held on March 19, 2012 before administrative law judge Gerald Langan ("ALJ"),

at which Plaintiff and vocational expert, Michele C. Giorgio ("VE"), testified.  (Tr.

52).  On April 27, 2012, the ALJ issued a decision denying Plaintiff's claims

because, as will be explained in more detail infra, Plaintiff's impairments did not

meet or medically equal any impairment Listing, and she could perform a range of

light work,[5] with avoidance of concentrated exposure to environmental irritants,

---

an individual to have an earlier application date than the date the application is
actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by
Defendant as part of the Answer on November 13, 2013.  (Doc. 10).

4. The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

5.

> (b) Light work.  Light work involves lifting no more than 20
> pounds at a time with frequent lifting or carrying of objects
> weighing up to 10 pounds.  Even though the weight lifted may
> be very little, a job is in this category when it requires a good
> deal of walking or standing, or when it involves sitting most of
> the time with some pushing and pulling of arm or leg controls.
> To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of
> these activities.  If someone can do light work, we determine

2

unprotected heights, moving machinery, and climbing ropes, ladders or scaffolds. (Tr. 52, 56).

On June 22, 2012, Plaintiff filed a request for review with the Appeals Council. (Tr. 46). On July 3, 2013, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-5). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on August 9, 2013. (Doc. 1). On November 13, 2013, Defendant filed an Answer and Transcript from the Social Security Administration ("SSA") proceedings. (Docs. 9 and 10). Plaintiff filed the brief in support of her complaint on December 27, 2013. (Doc. 11). Defendant filed a brief in opposition on January 30, 2014. (Doc. 12). Plaintiff did not file a reply brief, and the matter is now ripe for review.

Disability insurance benefits are paid to an individual if that individual is disabled[6] and insured, that is, the individual has worked long enough and paid

---

       that he or she can also do sedentary work, unless there are
       additional limiting factors such as loss of fine dexterity or
       inability to sit for long periods of time.

20 C.F.R. § 404.1567.

6. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the date last insured.  It is undisputed that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010.  (Tr. 54).

Plaintiff was born in the United States on August 23, 1950, and at all times relevant to this matter was considered a "person closely approaching retirement age."[7]  (Tr. 88).  Plaintiff obtained a three (3) year degree in nursing, completed

---

has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

7. "Person of advanced age. We consider that at advanced age (age 55 or older), age significantly affects a person's ability to adjust to other work. We have special rules for persons of advanced age and for persons in this category who are closely approaching retirement age (age 60 or older)."  See § 404.1568(d)(4).  20 C.F.R.

some college credits, and can communicate in English. (Tr. 90). Her employment records indicate that she previously worked as a teacher's aide, a receptionist in a dental office, and later as a receptionist at a physical therapy office. (Tr. 90-93).

The records of the SSA reveal that Plaintiff had earnings in the years 1966 through 2009 . (Tr. 149). Her annual earnings range from a low of no income to a high of nineteen thousand four hundred eighty-six dollars and twenty-six cents ($19,486.26) in 1996. (Tr. 149). Her total earnings during those forty-three (43) years were one hundred ninety-seven thousand thirty-one dollars and seventy-six cents ($197,031.76). (Tr. 149).

Plaintiff's alleged disability onset date is April 1, 2003. (Tr. 52). The impetus for her claimed disability is a combination of rheumatoid arthritis ("RA"), vasculitis, and post spinal fusion complications. (Tr. 108). In a document entitled "Function Report - Adult" filed with the SSA in April of 2011, Plaintiff indicated that she was married and lived with her family. (Tr. 192). She indicated that, when her RA flared up, she was only able to shower if her husband was home. (Tr. 194). She would put food out for her animals, while her husband would take them for walks. (Tr. 193). She also noted that she could prepare easy meals daily for ten (10) to twenty (20) minutes at a time, while she less frequently made

---

§§ 404.1563(e).

"longer meals" since her illnesses began. (Tr. 194). She was able to perform light cleaning for about fifteen (15) to twenty (20) minutes, but her husband would help out with the laundry. (Tr. 194). She was able to walk "with no real issue," drive a car, and could go out alone. (Tr. 195, 197). She could grocery shop with the help of her husband once or twice a week. (Tr. 195). She could pay bills, count change, handle a savings account, and use a checkbook. (Tr. 195).

Regarding concentration and memory, Plaintiff stated that she could pay attention for fifteen (15) to thirty (30) minutes, indicated that her illnesses did not affect her memory, understanding, or ability to follow instructions, and that she did not need reminders to care for her personal needs or take medicine. (Tr. 194,197). She could handle stress and changes in routine "ok." (Tr. 198).

Socially, Plaintiff would spend time with her husband daily, and attended doctor's appointments on a regular basis. (Tr. 196-197). She liked to read and watch television daily, and would stencil and paint less often than she used to because of her RA and resulting hand swelling. (Tr. 196). She stated that she had limited interactions with others especially while taking Prednisone. (Tr. 197). She had no problems with authority figures. (Tr. 198). In the function report, when asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, memory, understanding, following

6

instructions, or getting along with others.  (Tr. 197).

Plaintiff reported she needed hand braces/ splints for inflammation, which was prescribed by her physical therapist.  (Tr. 198).  Also, she was prescribed Prednisone, Narvasc, and numerous other medications that will be further discussed.  (Tr. 94).

At her hearing, Plaintiff alleged that the following combination of physical problems prevented her from being able to work since April of 2003: (1) RA; (2) vasculitis; and (3) residual neck and back pain from her two (2) spinal surgeries. (Tr. 102).  In terms of physical symptoms, she experienced aches in her hands from the RA, headaches, disorientation and dizziness from the vasculitis, and neck and back pain from spinal problems and prior fusion surgery.  (Tr. 93, 95-97).  She testified that in 2011, she and her sister cared for her mother for seven (7) weeks after her mother had surgery.  (Tr. 99-100).

## MEDICAL RECORDS

### 1.     Raymond Behr, M.D.

Plaintiff has been a patient of Psychiatrist Raymond Behr, M.D., located in Great Neck, New York, since August of 1994.  Regarding the relevant records from the alleged onset date, Plaintiff had an appointment with Dr. Behr on July 24, 2003, for which she was a no-show.  (Tr. 222).  Plaintiff's medication for

7

depression, Parnate, was renewed on April 19, 2004, and she then had an appointment with Dr. Behr on April 26, 2004.  (Tr. 222).  At this appointment, it was noted that while she was doing well and had no relapse of her depression, she was ill with a severe viral infection from September of 2003 to February of 2004.  (Tr. 222).  At her next appointment with Dr. Behr on July 29, 2004, treatment notes show that she had an exacerbation of her vasculitis due possibly to the Parnate, which Dr. Wright recommended she discontinue.  (Tr. 222).  The medicine was discontinued, and she saw Dr. Behr again on August 9, 2004, at which time she reported doing reasonably well despite being off of the Parnate for two (2) weeks.  (Tr. 222).  She did not attend her August 19, 2004 appointment, and at her August 27, 2004 appointment, she reported feeling increasingly depressed, and was prescribed Wellbutrin as a result.  (Tr. 222-223).  At her appointment on September 7, 2004, treatment notes state she was doing well, was bright, alert, and happy, and a possible increase in dosage of her medication was discussed.  (Tr. 223).  At her October 20, 2004 appointment, Plaintiff reported that she was not feeling as well as she did on Parnate, and Dr. Behr increased the Wellbutrin dosage.  (Tr. 223).

Plaintiff did not have another visit with Dr. Behr until December 20, 2005, at which it was noted that she discontinued the Wellbutrin over one (1) year ago

because she felt "flat" and it gave her suicidal ideations. (Tr. 223). She had not been on any other antidepressants for the last year. (Tr. 223). She also reported that she had major difficulties sleeping, even with the aid of Ambien, and that she was experiencing suicidal ideations. (Tr. 223). He prescribed Nardil and Zyprexa for her depression symptoms. (Tr. 223).

Plaintiff had an appointment with Dr. Behr on March 6, 2006. (Tr. 224). Plaintiff noted that the Nardil was as effective as the Parnate had been, but that it was sedating. (Tr. 224). She also reported that she continued to have difficulty falling and staying asleep. (Tr. 224). Dr. Behr increased her Nardil dosage to further improve her depression. (Tr. 224).

Plaintiff's next appointment with Dr. Behr was on May 31, 2007. (Tr. 224). Plaintiff reported that she had moved to Pennsylvania on a permanent basis, and that she had stopped taking Nardil eight (8) months prior because her vasculitis had flared and her physician thought it was due to the medication. (Tr. 224). However, her vasculitis flares continued despite the Nardil cessation, so she had resumed taking the medication three (3) weeks prior to this appointment, and started feeling "significantly better." (Tr. 224). She reported to have continued difficulty sleeping, and was taking Prednisone, Norvasc, and over-the-counter Diphenhydramine. (Tr. 225).

Plaintiff visited with Dr. Behr on August 7, 2008. (Tr. 225). She reported decreasing her dosage of the Nardil without Dr. Behr's permission, and he discussed with her the fact that these decreases have historically left her feeling more depressed than when she is taking a higher dose. (Tr. 225). She was noted to be mildly to moderately depressed, and that she did not like where she was living. (Tr. 225). It was reported that she had neck surgery for a spinal column compression, and that she discontinued the Nardil at that time. (Tr. 225). She continued to have difficulty sleeping, and sleep aids had unwanted side-effects. (Tr. 225). She was prescribed Nardil and Xanax. (Tr. 225).

On March 18, 2009, Plaintiff had an appointment with Dr. Behr, and reported she had been doing extremely well, her physical health was good, and she was sleeping well at night. (Tr. 225-226). She was prescribed Nardil and Xanax. (Tr. 226). Dr. Behr called in prescription refills on June 10, 2009 for Xanax. (Tr. 226).

Plaintiff had an appointment with Dr. Behr on October 12, 2009, at which she reported that she was doing well, but that there were times when she felt slight if not moderately depressed. (Tr. 228). He recommended an increase in the Nardil dosage for the depression. (Tr. 228). She also reported that when she ran out of Xanax during the summer, she felt an uncomfortable pressure in her chest

accompanied with irritability that she did not have when she was taking the

Xanax. (Tr. 228). She was also taking Norvasc, Prednisone, Ecotrin and Prilosec.

(Tr. 228). She was diagnosed formally with Major Depressive Disorder, recurrent

and severe type. (Tr. 228). Dr. Behr prescribed Nardil and Xanax at this

appointment. (Tr. 228).

At her January 20, 2011 appointment with Dr. Behr, Plaintiff reported that

she was doing well, and that she had increased her Nardil dosage, which helped

with her depression symptoms. (Tr. 229). It was noted that she was active, went

on a cruise, was social, and was "always doing something." (Tr. 229). The

depression was found to be caused by the pain from her arthritis. (Tr. 229).

Plaintiff's Major Depressive Disorder was noted to be recurrent and moderate, and

she was prescribed Nardil, Tigan and Xanax at this appointment. (Tr. 229).

### 2.   **Ramesh Babu, M.D.**

On October 8, 2007, Neurosurgeon Dr. Babu referred Plaintiff for a

radiological consultation of her cervical spine. (Tr. 591). This study revealed a

clinical indication of C5-C6 listhesis, and correlated with the CT cervical study

ordered by Dr. Wright that is discussed in the following section. (Tr. 591). On

October 12, 2007, Dr. Babu ordered a CT scan of Plaintiff's cervical spine that

showed a Grade I retrolisthesis of the C5-C6 disc level with degenerative disc

desiccation and loss of disc height, mild posterior ossific ridging at C5-C6

producing mild canal narrowing, and mild left-sided C5-C6 foraminal narrowing.

(Tr. 597-598).

On October 15, 2007, Dr. Babu sent Dr. Wright a letter stating that Plaintiff

had degenerative disc disease with collapse of the disc space at C5-C6 with

minimal spinal cord compression and instability at the same level. (Tr. 345, 521).

He also informed Dr. Wright that he advised her to undergo a cervical disectomy

and fusion, and requested Dr. Wright's clearance for the surgery. (Tr. 345, 521).

On October 25, 2007, Plaintiff underwent surgery performed by Dr. Babu at

New York University Medical Center. (Tr. 209). Her preoperative and

postoperative diagnosis was cervical spondylosis and cervical instability at C5-C6.

(Tr. 209). The operation consisted of a partial vertebrectomy of C5 and C6, a

discectomy of C5-C6, an interbody fusion of C5-C6, and a plating and

instrumentation of C5-C6 using a Zephir plate. (Tr. 209, 600).

Dr. Babu sent a letter to Dr. Wright on December 10, 2007, stating that

Plaintiff was doing well after the cervical spine surgery, and that he instructed her

to progressively increase activities of daily life. (Tr. 599).

On April 2, 2009, Dr. Babu ordered an MRI of Plaintiff's lumbar spine for

persistent back pain. (Tr. 604). The impression stated that Plaintiff had disc

12

degeneration at T12-L1 with shallow eccentric disc herniation to the left, mild disc bulging toward the left neural foraminal at L1-L2 and L2-L3, mild biforaminal disc bulging at L3-L4, moderate disc degeneration with mild to moderate disc protrusion and shallow disc herniation with left greater than right neural foraminal narrowing at L4-L5, mild disc bulging at L5-S1, and no evidence of fracture, dislocation, or marrow replacing process. (Tr. 604-607).

On April 15, 2009, Dr. Babu referred Plaintiff to PRO Rehabilitation Services for an extremity evaluation. (Tr. 609). At this evaluation, Plaintiff stated she had ongoing right-sided pain radiating into the front of her body for over a year. (Tr. 609). She also reported that the pain was severe to the point where she would have to sometimes bend over and wait a few minutes for the pain to subside. (Tr. 609). She also had to lay down throughout the day to alleviate her pain, and was taking Vicodin and Ibuprofen to help with pain and spasms, but reported this medicine was not helping much. (Tr. 609). The assessment found that Plaintiff had the following limitations: decreased postural awareness and endurance in unsupported sitting and standing; increased tenderness to palpation to the bony and soft tissue structures of the thoracic and lumbar spine; increased muscle spasms throughout the thoracic and lumbar muscles; decreased active and passive range of motion of the thoraco-lumbar spine; decreased joint mobility

throughout the thoraco-lumbar spine; decreased functional muscle testing throughout the trunk and hip musculature; decreased manual muscle testing throughout the trunk and lower extremities; decreased single limb balance; poor body mechanics with transfers; positive special tests for an sacroiliac dysfunction and neural tension signs; increased functional limitations associated with running the sweeper, walking, sitting, and sleeping. (Tr. 612). Dr. Babu prescribed physical therapy for Plaintiff for two (2) times a week for eight (8) weeks. (Tr. 613).

On May 26, 2009, Dr. Babu sent a letter to Dr. Wright. (Tr. 326, 502, 616). This letter stated that Plaintiff had a herniated disc at L3-L4 and that she was experiencing pain in her right shoulder and thoracolumbar area, which was not responding to physical therapy. (Tr. 326, 502, 614). Dr. Babu informed Dr. Wright that he suggested surgery, and requested Dr. Wright's clearance for the surgery. (Tr. 326, 502, 616).

On June 12, 2009, Dr. Babu ordered a pre-surgical chest x-ray, which showed post-surgical changes in the spine, and no evidence of acute cardiopulmonary abnormalities. (Tr. 327, 503, 617).

On June 23, 2009, Plaintiff underwent another spinal operation performed by Dr. Babu. (Tr. 207, 614). Her preoperative and postoperative diagnoses was a

thoracic herniated disc at T12-L1. (Tr. 207, 614). The operation consisted of a right T12-L1 hemilaminotomy, medial facetectomy, and decompression of the nerve root, and a T12-L1 posterolateral fusion. (Tr. 207, 614).

### 3. Grace Wright, M.D.

Plaintiff was a patient of Rheumatologist Dr. Wright from January of 2000 to March of 2011. The treatment notes from the numerous, relevant visits are largely illegible, including the dates on which treatment occurred. (Tr. 235-289, 411-460, 620-630). From what can be gleaned from these treatment notes, Dr. Wright noted Plaintiff had joint pain and swelling in her fingers, wrists, elbows and ankles due to RA, severe headaches, several disc herniations at the cervical and thoracic levels that caused pain, inflammatory osteoarthritis, vasculitis, vertigo, chest pain, difficulty sleeping, depression, fatigue, and weakness. (Tr. 235, 243-244, 246, 249, 254, 256, 258-261, 263-270, 272, 274-275, 277-278, 280-282, 284-289, 411-460, 620, 623-624, 626-627, 629-630). Plaintiff was treated with Prednisone, Plaquenil, Norvasc, Ecotrin, Prilosec, Embrel, Crestor, Vicodin, Nardil, Naprosyn, and Klonopin. (Tr. 235, 243, 249, 255-256, 258, 260-264, 266-272, 276-289, 411-460, 621, 623-624, 626-627, 629-630). Dr. Wright ordered blood work throughout the course of Plaintiff's treatment. (Tr. 292-308, 468-484, 593-595, 632-638).

On November 27, 2006, Dr. Wright referred Plaintiff to Heartwise Cardiology for an echocardiogram. (Tr. 353, 529). The impression showed "trace mitral and tricuspid regurgitation" and "normal LV size and function." (Tr. 354, 530).

On September 21, 2007, Dr. Wright ordered an MRI of Plaintiff's cervical spine without contrast due to Plaintiff's complaints of severe back pain. (Tr. 211, 347-351, 523-527, 592). The findings revealed multilevel cervical spondylosis, most severe at the C5-C6 level with altered signal within the spinal cord and a moderate right neural foraminal narrowing, and a large disc protrusion at T2-3 on the right. (Tr. 212, 347-348, 351, 524-527, 592).

On October 15, 2007, Dr. Wright sent a pre-operative report to Dr. Babu. (Tr. 342, 518). This report noted Plaintiff's history of vasculitis, spondylosis with cervical spinal instability, and acute myocardial disease secondary to vasculitis. (Tr. 342, 518). The medications Plaintiff was taking at the time of the report were Norvasc, Prednisone, Vitamin C, Prilosec, and Ecotrin. (Tr. 342, 518).

In March of 2008, Dr. Wright referred Plaintiff to PRO Rehabilitation Services for a spinal evaluation due to left-side neck, upper left shoulder, and mid-deltoid pain. (Tr. 338, 514). At this evaluation, Plaintiff reported that the pain was a sharp, shooting pain, and that she had more pain after activities after

16

activities such as cooking, cleaning, lifting and overhead activity.  (Tr. 338, 514).

The treatment notes also state that x-rays authorized by Dr. Wright "were

significant for bone spurs, [degenerative disc disease] and spinal decompression."

(Tr. 338, 514).  An MRI confirmed these x-ray results, and Plaintiff had an

anterior cervical fusion on October 25, 2007.  (Tr. 338, 514).  Before surgery, she

had difficulty walking, concentrating, and generalized fatigue throughout the

bilateral upper extremities and lower extremities.  (Tr. 338, 514).  Post surgery,

she had difficulty opening jars, lifting greater than ten (10) pounds, and running

the vacuum cleaner due to increased pain in the left upper extremity.  (Tr. 338,

514).  Her past medical history notes that she had vasculitis and a myocardial

infarction in 1999.  (Tr. 338, 514).  Her medications at the time of this visit

included Prednisone and Vicodin.  (Tr. 338, 514).  The physical therapist's

assessment from this visit concluded Plaintiff experienced the following:

decreased range of motion of the cervical spine; decreased joint mobility in the

lower cervical and thoracic spine; decreased flexibility throughout the cervical and

thoracic region; increased tenderness to palpation to the bony and soft tissue

structures of the cervical spine; increased muscle spasm of the cervical and

thoracic spine; decreased strength throughout the cervical and upper extremity

musculature; decreased grip strength; decreased abdominal strength; and increased

17

functional limitations associated with activities such as cleaning, vacuuming, lifting, reaching, pulling, walking, strength training, and shopping.  (Tr. 340, 516).

On September 15, 2008, Dr. Wright referred Plaintiff for an echocardiogram.  (Tr. 335, 511).  This test revealed "trace tricuspid regurgitation and trace mitral regurgitation," "normal LV size and function," and "trace pericardial effusion."  (Tr. 335, 511).

In March of 2009, Dr. Wright ordered a CT scan of the thoracic spine without contrast.  (Tr. 329, 505).  This showed a narrowing of the T12-L1 disc space with a small focal central disc herniation in the midline indenting the dural sac, mild thoracic spondylosis, and kyphosis.  (Tr. 329, 505).

On June 16, 2009, Dr. Wright sent a pre-operative report to Dr. Babu, which stated that Plaintiff was being referred for thoracic spine surgery, and that she had a history of vasculities, spondylosis with cervical spine instability, and acute myocardial disease secondary to vasculitis.  (Tr. 323, 499).  She also stated that Plaintiff was taking Norvasc, Prednisone, Vitamin C, and Prilosec.  (Tr. 323, 499).

On October 25, 2009, Dr. Wright referred Plaintiff to Heartwise Cardiology in New York for an echocardiogram, which revealed a "trace TR and MR" and a "Normal LV size and function."  (Tr. 320, 496).

On January 19, 2010, Dr. Wright referred Plaintiff to PRO Rehabilitation

Services for an extremity evaluation. (Tr. 315, 491). At this appointment,
Plaintiff noted that she had back surgery on June 23, 2009, due to ongoing right-
sided pain, and that since the surgery, she continued to experience upper and lower
back pain with an increase in severity from morning to night. (Tr. 315, 491). She
stated that she had to take two (2) Vicodin to be able to perform household chores,
and that she was having difficulty exercising due to the pain throughout her neck,
shoulders and back. (Tr. 315, 491). It was noted that she also was diagnosed with
RA, and that she underwent a microdisectomy of T12-11. (Tr. 315, 491). The
physical therapist's impression from this evaluation was as follows: decreased
postural awareness and endurance in unsupported sitting and standing; increased
tenderness with palpation to the bony and soft tissue structures of the thoracic and
lumbar spine; increased muscle spasm throughout the thoracic and lumbar
muscles; decreased range of motion throughout the thoracolumbar spine;
decreased functional muscle testing throughout the trunk and hip musculatures;
decreased manual muscle testing throughout the trunk and lower extremities;
decreased single limb balance; poor body mechanics with transfers; positive
special tests for sacroiliac joint dysfunction and tension signs; and increased
functional limitations associated with household activities such as walking, sitting,
and sleeping. (Tr. 318, 494). Based on this evaluation, Plaintiff was prescribed

twice weekly physical therapy sessions. (Tr. 319, 495).

On January 13, 2011, Dr. Wright ordered an MRI of the brain for Plaintiff's

gait disturbance and facial numbness. (Tr. 311, 487).[8] This test revealed that

Plaintiff had moderate cortical sulcal prominence, of doubtful significance, and a

few focal defects in the periventricular white matter, of questionable significance.

(Tr. 311). On February 18, 2011, Plaintiff underwent a bone density scan ordered

by Dr. Wright, and this scan revealed an increased risk of fracture in the lateral

spine, a slightly increased risk of fracture of the left femoral neck and left total

hip, and an average risk of fracture in the remainder of the spine. (Tr. 313, 489).

On November 8, 2011, Dr. Wright ordered a bilateral ankle and feet x-rays.

(Tr. 639-640). This ankle x-ray concluded that Plaintiff's right ankle mortise and

joint space were intact, but that in her left ankle, there was mild diffuse soft tissue

swelling. (Tr. 639). The x-ray of Plaintiff's feet concluded that, with regards to

both the right and left foot, there were no fractures, dislocations, lytic changes,

blastic changes, or spurs, but that there was mild distal interphalangeal joint space

degeneration of the second and fifth toes. (Tr. 640).

On June 19, 2012, after the ALJ had issued a decision, Dr. Wright

---

8. It is noted that Plaintiff's 2011 and 2012 appointments with Dr. Wright
occurred after Plaintiff's date of last insured.

completed an RFC Assessment form for Plaintiff regarding the functional limitations that related back to the disability period of Plaintiff's claim. (Tr. 37). Dr. Wright opined that Plaintiff could occasionally lift or carry less than ten (10) pounds, could stand or walk less than two (2) hours in an eight-hour work day, could sit for a total of less than six (6) hours in an eight-hour work day, and was limited in pushing and pulling in both the upper and lower extremities. (Tr. 38). She opined that Plaintiff could only occasionally climb ramps, ladders, stairs, ropes, and scaffolds, and could never balance, stoop, kneel, crouch, or crawl. (Tr. 39). She stated that Plaintiff would be unlimited in reaching and feeling, but would be limited in handling and fingering because the "involvement of all small joints of the hands impairs [her] fine motor functions [and] [s]he has fixed joint deformities with bouts of painful swelling of the wrists and hands." (Tr. 40). When asked to explain how and why the evidence supported these limitations, Dr. Wright stated Plaintiff has severe RA with involvement of all small joints of the hands with swelling, bone damage and weakness, disc herniations and pain despite surgical repair, and systemic vasculitis with a myocardial infarction. (Tr. 38). These impairments, Dr. Wright opined, have left Plaintiff with unpredictable exacerbations that cause joint pain and swelling, a rash, low blood pressure, and fatigue. (Tr. 38, 42).

21

### 4.    Sheryl Feingold, M.D.

On June 25, 2003, Dr. Feingold ordered a dermapathology report.  (Tr. 532).

The diagnoses provided by this report stated that Plaintiff had perivascular

dermatitis with nuclear dust and fibrin from the right upper arm, which was

suggestive of early leukocytoclastic vasculitis.  (Tr. 532).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

22

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Keefe</u>

<u>v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Martin v. Sullivan</u>, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565

(1988) (quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938));

<u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008);

<u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether

a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).  "At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## ALJ DECISION

Initially, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010. (Tr. 54). The ALJ then proceeded through each step of the sequential evaluation process and determined that Plaintiff was not disabled. (Tr. 54-59).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of April 1, 2003. (Tr. 54).

26

At step two, the ALJ determined that Plaintiff suffered from the severe[9] combination of impairments of the following: "[RA]; vasculitis, status post fusion T12-L1; status post cervical discectomy and fusion (20 C.F.R. 404.1520(c))." (Tr. 55).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (Tr. 56).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work, but must avoid concentrated exposure to environmental irritants, unprotected heights and moving machinery, and should never climb ropes, ladders or scaffolds. (Tr. 56). Specifically, the ALJ stated the following:

> In summation, the undersigned reviewed the totality of the

---

9. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

> evidence and finds that it establishes that [Plaintiff]
> experiences symptomatology secondary to [RA] and
> vasculities. She is also status post fusion at T12-L1 and status
> post cervical discectomy and fusion. However, the record is
> devoid of evidence establishing that the symptomatology she
> experiences secondary to these conditions renders her
> incapable of performing work related tasks on a continuous and
> sustained basis.

(Tr. 58).

At step five of the sequential evaluation process, considering Plaintiff's

RFC, the ALJ determined Plaintiff "was capable of performing past relevant work

as a receptionist and office manager. . . (20 C.F.R. 404.1565)." (Tr. 58).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between the alleged onset date of April 1,

2003, and the date of the ALJ's decision. (Tr. 21).

## DISCUSSION

Plaintiff argues that substantial evidence does not support the ALJ's finding

that she is able to perform a full range of light work because she presented medical

evidence that she has difficulty standing and walking as a result of surgery to her

lumbar spine, and difficulty using her hands as a result of RA. (Doc. 11, pp. 9-

10). Furthermore, Plaintiff argues that the matter should be remanded for

consideration of the RFC assessment provided by her treating physician, Dr.

Wright. (Id.).

Defendant responds by asserting that the ALJ's RFC determination was supported by substantial evidence because the "record is devoid of evidence establishing symptomatology Plaintiff experience[d] secondary to these conditions rendering her incapable of performing work-related tasks on a continuous and sustained basis." (Doc. 12, p. 10), citing (Tr. 58). Defendant notes that Plaintiff's physicians, Dr. Babu, Dr. Wright, and Dr. Behr, did not indicate that she had functional limitations that would preclude her from working due to the RA, vasculitis or spinal problems. (Id. at 10-11). Defendant then asserts that the ALJ's finding that Plaintiff was not fully credible was supported by substantial evidence. (Id. at 12). Defendant also argues that the ALJ correctly determined that Plaintiff was capable of performing past relevant work because Plaintiff did not meet her burden of proving she could not. (Id. at 12-13). Finally, Defendant contends that the evidence regarding Dr. Wright's RFC assessment does not warrant remand because it was not available to the ALJ at the time of the hearing, did not concern the relevant time period of Plaintiff's claim, and Plaintiff failed to present evidence of good cause for not obtaining the RFC assessment from Dr. Wright prior to the hearing. (Doc. 12, pp. 13-15).

Initially, it is determined that the ALJ's RFC assessment is supported by

substantial evidence.  The ALJ stated the following:

> [Plaintiff's] longitudinal treatment history reveals that she
> suffers from several severe impairments.  However, the totality
> of the evidence adduced reveals that the symptomatology she
> experiences as a result of these conditions is mild to moderate,
> at best.  There is no evidence indicating that her symptoms
> preclude her from performing a range of work[-]related tasks
> on a continuous and sustained basis.  Accordingly, the
> undersigned finds that [Plaintiff] can perform a range of work[-
> ]related tasks consistent with the [RFC] cited above.

(Tr. 56).

The ALJ was correct that there was no medical opinion evidence available

for consideration with regards to any functional limitations Plaintiff experienced

as a result of her impairments.  The ALJ had no duty to further develop the record

regarding the medical opinion evidence because Plaintiff retains the burden of

proving her disability.  20 C.F.R. §§ 404.1512, 1513(d); see Rutherford v.

Barnhart, 399 F.3d 546, 551 (3d Cir. 2005).  Furthermore, as discussed by the

ALJ, Plaintiff testified that she could use the computer, write, pick up items under

five (5) pounds, was able to go on a cruise, acted as her mother's care-giver for

seven (7) weeks, had no problems or difficulties walking, had no problems using

stairs, could sit for two (2) hours without needing to stand up, and could stand

"until the middle of the day."  (Tr. 93, 99-100, 102-105).  Therefore, based on

Plaintiff's own testimony, and the lack of medical opinion evidence describing any

functional limitations, there is substantial evidence to support the ALJ's RFC determination.

With regards to the new evidence that was presented to the Appeals Council, namely the RFC assessment provided by Dr. Wright in June of 2012, the Third Circuit Court of Appeals has held that "although evidence considered by the Appeals Council is part of the administrative record on appeal, it cannot be considered by the District Court in making its substantial evidence review." Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001). As a result, even if new evidence is presented to and considered by the Appeals Council, the district court is limited to review of the ALJ's decision, not that of the Appeals Council. Id. Thus, evidence submitted after the ALJ's decision cannot be used to argue that the ALJ's decision is not supported by substantial evidence. Matthews, 239 F.3d at 594-95.

However, such evidence can be considered to determine whether it provides a basis for remand under sentence six (6) of section 405(g). Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Under sentence six (6) of section 405(g), the evidence must be "new" and "material," and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id. The Third Circuit Court of Appeals explained that

to be material "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id. Furthermore, "material" means that the evidence must be probative. Id. The evidence, therefore, must create a reasonable probability that the new evidence would have changed the ALJ's decision had it been presented to him. Id.; see also Willis v. Colvin, U.S. Dist. LEXIS 50546, *22 (M.D. Pa. April 10, 2014) (Carlson, M.J.) ("A 'reasonable possibility,' while requiring more than a minimal showing, need not meet a preponderance test. Instead, it is adequate if the new evidence is material and there is a reasonable possibility that it is sufficient to warrant a different outcome."). Finally, Plaintiff must show "good cause" for not incorporating the evidence into the earlier administrative record the ALJ used to determine the claim. Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 472 (3d Cir. 2005).

In the present case, the new evidence in the form of Dr. Wright's RFC assessment was presented to, but rejected by, the Appeals Council, which stated that, "[t]his new information is about a later time. Therefore, it does not affect the decision about whether [Plaintiff] w[as] disabled at the time [she] w[as] last insured for [DIB]." (Tr. 2). This Court agrees with the Appeals Council that the

32

RFC assessment did not relate to the relevant disability time period because the assessment contains no statements that the functional limitations described relate to the disability period, even if the assessment intended to relate the functional limitations to the disability period. (Tr. 37-42). Therefore, it cannot be determined that the RFC assessment was new and material because it fails to indicate that the functional limitations it discusses relate back to the relevant disability time period.

Moreover, Plaintiff has failed to show "good cause" as to why she did not obtain the RFC assessment provided by Dr. Wright and incorporate it into the earlier administrative record the ALJ used to make his decision. See Scatorchia, 137 F. App'x at 472 (holding that remand was not warranted because the plaintiff "[did] not provide any explanation for her failure to acquire this additional medical information prior to her hearing"); see also Matthews, 239 F.3d at 595 (holding that remand was not warranted as good cause was not shown because the plaintiff could not "explain [] why she did not attempt to obtain [an] evaluation at a time when it could be considered by the ALJ."). Consequently, a "sentence six" remand is not warranted because although the RFC assessment completed by Dr. Wright in June of 2012 is new and material, and there is a reasonable probability that this evidence would have caused the ALJ to reach a different conclusion,

Plaintiff has not shown "good cause" as to why this evidence was not initially obtained and presented to the ALJ for consideration.

**Date**: September 12, 2014

United States District Judge